This is Number 2011-3015, Armstrong against the Treasury Department. Mr. Burns. Good morning, Your Honour. Kevin Burns for the appellate in this case, Mr. Armstrong. We are unfortunately back before you again. We had thought after your last opinion we would get a hearing and the issue of whether or not we were fraudulently induced to enter into an agreement would have been addressed. The problem with this case is evident in the briefs, which spend a long time talking about the underlying facts. Appellate courts don't make factual records. They decide issues of law. The fact that we are trading back and forth what these facts mean is the best illustration for this court as to why we should be able to get a hearing on this issue. What is the law that obligates the government to give you a hearing? Well, if a contract is fraudulently induced, it's vitiated ab initio. And we're arguing that the issue here is that we were fraudulently induced to enter into the contract and we produced sufficient evidence to establish at least the right to challenge the contract as being an issue of fraud. Without being able to develop an actual factual record, how can we produce clear and convincing evidence of fraud when what we did produce from the things we did give to the MSPB, here's what we did produce. We produced an indication that undisclosed contacts by supervisors that were given were made to an employer after that employment made the offer. We were told there was a waiver. There's been no proof of the waiver. It's not produced in any evidence. It's not produced in any document. We were also produced in the district court case evidence that the very supervisor that talked to the agency, Michael Delgado, one of them, misrepresented to the court his contact. He got under oath and denied he ever did it. Kathy Horsley, the subsequent person who was hiring Mr. Armstrong, who was herself an inspector general, testified under oath and produced contemporaneous notes that she, in fact, did have contacts with him, where he said, if I tell you not to hire this gentleman, he'll sue me. Well, that's what we did. What happened on the remand other than that you didn't get an oral hearing? What was done? I think they said we were timely. They said that, well, we timely brought this to their attention, but based on our prior decision, there's really no fraud here. What do you mean they said? Did you make submissions to them? The MSPB, yes. We made submissions to the MSPB on the record that this was fraudulent behavior. And what happened was— Are you talking now about the remand? Oh, on the remand, no. On the remand, you made no submissions? We relied on the record that was presented below. We had no more information that was gathered after the matter because— There were no more new facts. Well, they couldn't be established because we have no—the reason we were able to establish new facts below was we had a federal lawsuit where, over agency objection, Judge Robinson allowed us limited inquiry into the agency's conduct. But now all that was before the MSPB. Those materials were, yes, before the MSPB. But what the MSPB did not decide was the issue of—they didn't really address the issue of what constitutes fraudulent inducement and how the evidence in this case wouldn't establish some sort of fraudulent inducement, either active or constructive. And the government's argument reflects that. They say, well—they focus on Lori Questwell, the attorney for the government. They say, well, she didn't know. As we just saw what the Court says, the government speaks to its attorneys and agents. What Lori Questwell knew individually is irrelevant. It would only show even a more heinous fraud if she actually knew those facts and didn't disclose them. But the fact that the agency had made these contacts to its senior officials and that undermined the entire value of a settlement agreement that was hard-fought and negotiated— moving on to another agency. So when this agency comes out now and talks about the egregiousness of Mr. Armstrong's conduct, it's incorrect. The second thing the agency is incorrect about is they go to the penultimate issue of whether Armstrong would be hired. And they say, well, Armstrong failed to tell Horsley the circumstances. When Armstrong was interviewed by Horsley for the job—he was interviewed in March of 2007. He was given the job offer in July. He gave notice of his departure. The six letters went out in August. The day—two days after the six letters went out, we, as required by law, gave notice of potential Federal Tort Claims Act claims and a Privacy Act suit. The record shows on the very next day, August 28, the two supervisors contacted USDA. That's when they had the discussions in response to him making a demand under the FTCA and the Privacy Act. That was never disclosed to us. And had we known of those facts, I guarantee you Mr. Armstrong would have never entered that settlement agreement. Now, were all of these facts before the MSPB? They should have been, yes. Yes, I believe they were. And the question I have is how then could the MSPB focus its indication on fraudulent inducement solely on what the attorney claimed? In other words, the totality of the circumstances in a fraud case—or I have to prove by clear and convincing evidence that but for this matter, we would have not entered the settlement agreement. The whole purpose of the relief was to allow him to go work with the USDA. Again, he had been given an actual job offer. If this was in the private sector—and we tried to raise this because it can't be raised under the Federal Tort Claims Act—if this was in the private sector, this would have been intentional interference with employment. Because agency officials would have gone outside the scope and contacted or have been in contact with this person telling them not to hire him when the agency itself—and if you look at Ms. Cresswell's own emails—says, on the February 5th email, which is at page 86, she's talking about the fact that I have stated the only information that was conveyed to the USDA by agency management officials concerning the proposal, the decision memorandum, and any disciplinary action is no comment. Now, that's significant because they keep going that Armstrong should have disclosed that he was under investigation. When Armstrong accepted employment, he wasn't under investigation. The criminal investigation that they brought against him was dismissed the day it was brought to the U.S. Attorney's Office. He was cleared. And that's what he told Ms. Horsley. The only information he had about a proposed action was when they issued the proposed action, and that was well after September of 2007. Ms. Horsley never asked Mr. Armstrong about the subsequent events, about the letters. So he didn't lose his employment, as the Board says, in the penultimate issue because he wasn't honest with the USDA because the issue never came up because he didn't get the proposed action, so the USDA had already put the matter on hold. So the government's factual predicate and its timeline is incorrect. The reason that Kathy Horsley didn't offer my client a job really is an issue of damages. It doesn't go to the underlying fraud. The question for the Court is when an agency, through its agents, acts in a manner that's contrary to an agreement they entered, when it fails to disclose those contacts, when those contacts are material and relevant and the lack of disclosure is relied upon by the party, is that fraudulent inducement? Because if it is fraudulent inducement, no merger clause, no contractual language applies. Once there is fraud in the inducement, the contract ceases to exist because the parties can't come to a meeting of the minds. And the reality of this situation is fairly clear. We were duped, and I think the Court was on the right track when it brought that up in Houston. We were duped. Now, if you look at Ms. Cresswell's email, assuming we accept the government's argument, it's hardly a situation of clarity. She says the agency response to Director Horsley's August 2007 inquiry—remember, these contacts were recorded in August—is described in the January 2008 letter from Director Horsley. The matter was pending and no further information could be conveyed. Now, that has nothing to do with post-December contacts. That has to do with contacts in August. And the agency led us to believe that their only comment was no comment. And the specific thing we argued for is we are concerned that if the agency is informed of any negative information other than what we agreed to, they will rescind this job offer. And we were told this was the official response. And that was actually implemented in the underlying settlement agreement. So how can the agency stand here and argue that this is not a material fact that goes to the core of the agreement itself? And how can the Board not understand that? Am I supposed to cross-examine my opposing counsel and pin her down on minutiae that I don't know about? How would I know about contacts that his supervisor held? A waiver? Where's the waiver? We keep talking about a waiver. It's a written document. There's no waiver presented in this record. And we want to contest that. We want to contest what these people did. They said, well, we had the opportunity to depose them and get information. Really? That was in a Privacy Act suit under certain restrictive positions. Something else the agency doesn't tell you about how we found out about this. And the Board doesn't tell you about how we found out about this. We wouldn't have found out about it if we didn't have the Privacy Act suit. And over their objection, we hadn't compelled them to produce this evidence, and they let it slip out on the side. One other issue I want to get to before I finish up, because most of this is in my brief. Let's go to the memorandum of interview that they rely upon, which is at page 177 and 178, for the statements of Ms. Horsley. That's not a statement if it's Ms. Horsley. That's a statement of an agent taking a statement of Ms. Horsley. It's hearsay. And what it doesn't say, the government says, well, the reason our agents went to talk to Ms. Horsley was because we were conducting an investigation into letters. If that's true, judges, I ask you to look at this document and find out where anybody is requesting anything about any letters. Because what they're talking about is whether Hermie Armstrong is candid or not. See, this agency laid down a barrage against us. And it's doing basically – what it did was it led us to believe that my client, if he accepted a 30-day suspension, could go and sin no more with the United States Department of Agriculture. And then it undertook every possible step it could to make sure that couldn't happen, and it didn't bother to tell us about it. Now, in the real world, where attorneys negotiate settlement agreements, and in the real world where plaintiffs actually bring cases, we rely upon the word of the other counsel. We rely on them because that's what we're supposed to do as professionals. There's an actual ethical thing that requires us to be candid to one another and to the tribunal. And the other thing that happens that we rely upon is in a settlement agreement we rely upon if the relief is go to another agency and we agree you can go to the judge's agency, you're not withholding facts from us, which would undermine that completely. Now, we didn't have a chance to depose Ms. Horsley until well into the Privacy Act litigation. And there's a factual record that was before the board that doesn't support their position that my client wasn't hired because of what Harry Armstrong said. And the reason is because he got hired, then the letters went in, then these contacts went in, and then the thing was placed on hold. The ultimate reason that was presented to the board for why he wasn't hired was what Ms. Horsley testified in the deposition. He was too reputationally damaged by all of this material for me to offer him a position as a law enforcement agent. So the underlying allegations didn't even matter to me anymore. In other words, the shotgun letters and the disclosures by the representatives, that's what torpedoed this man's job opportunities. I think it stretches credulity for the board to ignore our opportunity to at least gather a factual record. Remember, this was fraudulent inducement. We should have been able to reset the clock on this entire hearing. We're not asking – we weren't originally asking this court for you to rule in our favor. We just want the opportunity to get some justice here. If anything else, we just deserve to know whether or not we will lie to. Mr. Armstrong deserves that, every federal employee deserves that, and every lawyer engaging in a settlement discussion deserves that. Otherwise, I have to sit there and parse out through language what they're really saying. And that's not how settlements are going to be addressed in the real world. Finally, let me just say this. We pursued this case with an almost Ahab-like quality because we think that – well, Judge Robinson called us involved in a snipe hunt. And the history of this case, we file a Privacy Act case, and on the eve of the Privacy Act case, a federal employee comes out and says, oh, I learned this. And so the res ipsa loquitur for the Privacy Act case goes out the window, and now we have to pursue the individual employee for the disclosures. On the settlement agreement, when we think he's going to another place, we're told, actually, there were all these contacts. And we're told them well after the fact and well after the settlement has ended into, even though they were known beforehand. Then we're told as we come into court here that we have no proof of fraud, even though we've produced the actual testimony of the deputy inspector general for an agency that's contradicted by the inspector general for another agency. And we have the testimony of a lawyer who is fumbling to tell us why she didn't tell us about this material. Why can't we get a hearing on this? Now, we've asked for some relief on this because Mr. Armstrong shouldn't have anything to impose more than a 30-day suspension. If the settlement agreement's out, he should go back to being an employee, and they should have to reset the clock. The bottom line on this for the court, and I have 40 seconds left, so I'll be brief. The bottom line on this for you is do you fundamentally believe, as lawyers and as judges and as people practicing in the real world, that Mr. Armstrong would have entered into an agreement if he had known that his supervisor and a deputy inspector general had informed the inspector general of an agency, really, you're mediocre, shouldn't hire? Mr. Delgado's statement, even assuming Mr. Davis' statement wasn't sufficient, was certainly sufficient to any supervisor. I can't tell you that I wouldn't hire him because he might sue me. Well, unfortunately for Mr. Delgado, Ms. Horsley actually kept notes of the conversation. And again, the final thing is if that is the agency we're dealing with, if that is the credibility of the agency we're dealing with, can't we at least get a hearing to find out from these people what really went on? I see my time is up. Thank you, Your Honor. Thank you, Mr. Burns. Mr. Bowen. Yes, ma'am. May it please the court. Mr. Armstrong alleges that the MSPB improperly weighed the evidence that he presented to it in deciding the settlement agreement should not be voided on the grounds of fraud. The MSPB's decision, however, is supported by substantial evidence and should be affirmed for three reasons. First, the MSPB did not abuse its discretion in not holding a hearing because, first, this court explicitly said that it could hold hearings if they were warranted. And second, Mr. Armstrong never developed what he wanted to have done at the hearing. Second, Mr. Armstrong cannot demonstrate that he was misled by Tictor's failure to talk about the August, September, and December contacts when the very emails that Mr. Armstrong's attorney was sending said any contacts since December of 2007. And third, he cannot demonstrate that he was intentionally misled about the January 2008 contact because, despite having the opportunity to depose both the attorney who sent the email and the person who received the phone call, the hiring official at the USDA, he has not shown that the person who sent the email knew and he has not shown that it was a material contact. As a preliminary matter, it is necessary to lay out what the standards are for avoiding a contract on the grounds of fraud, especially a settlement agreement. In Harris v. Department of Veterans Affairs, this court established that a petitioner bears a heavy burden and must show that the agency knowingly concealed a material fact or intentionally misled him. Additionally, when there is a merger clause within the settlement agreement, a party cannot rely upon unwritten expectations unless he can show that the document itself is incomplete or that the merger clause itself was included by the grounds of fraud. This, as established in the briefs, this settlement agreement did have a merger clause. On the issue of whether or not the MSPB should have had a hearing, it did not abuse its discretion by not holding a hearing because, first, this court's 2010 decision said, quote, the MSPB should hold hearings, quote, on the merits if they are warranted following the decision on the timeliness issue. Again, this court then went on to say, at that point, the MSPB may conduct whatever proceedings are necessary to determine the merits of Mr. Armstrong's claim. But we intended the timeliness issue to be reexamined for a reason. And the reason for reexamining the timeliness issue was so that he could get whatever he needed in as evidence and not be procedurally hemmed. Isn't that right? This court's decision. The MSPB took our thoughts wisely under advisement and they waived the timeliness requirement. Correct. Then what happened? Then the MSPB said, well, what evidence has Mr. Armstrong presented to us? It then looked at his prior submissions where he had presented all the interview notes, where he presented excerpts from the depositions of Ms. Horsley and Ms. Cresswell. And it looked at the emails that had been sent between Ms. Cresswell and Mr. Armstrong's attorney. It then said, based upon the new evidence that Mr. Armstrong has submitted, we still concur with our prior conclusion that he has not met his heavy burden of establishing that the agency intentionally concealed, knowingly concealed a material fact. Was Mr. Armstrong given an opportunity to present even more evidence? The MSPB did not ask for further submissions. However, we note that on appeal, Mr. Armstrong asked that this court decide this case without indicating what other evidence he had to present and said, you can use the same record and the same appendix that I filed previously. Given that, we find it hard to say that Mr. Armstrong is entitled to a hearing where he does not attempt to show prejudice from not having the hearing. After the remand, did Mr. Armstrong make an attempt to introduce additional evidence? I am not aware of any, no, Your Honor. Should he have been given an opportunity to make further argument? Because the first decision, the first MSPB decision, had turned on really the merits, which this court had said, well, if you're making a timeless decision, that's a mistake to conflate. The board had before it all of the arguments that were really available, and Mr. Armstrong had already had an opportunity to present the arguments that, in fact, his evidence showed a knowing concealment of a material fact. Then what do you think was the point of our making a remand to the board for them to consider whether the timeliness issue on his submission should be waived? An oral argument before, and in this court's prior decision, this court indicated that it did not think it was appropriate for the MSPB to be making judgment calls on whether or not the evidence would eventually show that he would win when it was trying to determine whether or not the petition was itself timely or the timeliness should be waived. Thus, the point of this court's prior order was to tell the MSPB, for this case and going forward in the future, you should separate the timeliness determination and the merits decision. This court explicitly held that it may be that Armstrong's new evidence, the evidence that he had presented previously, will not change the outcome. We expressed no opinion on whether this is so. So this court was explicitly not making any decision about whether or not the MSPB's merits determination would be correct. So you think we were sending a more general message to the board as to how to separate timeliness from merits and then saying, now deal with the merits one more time? Yes, Your Honor. That's your reading of it? That is my reading of the decision. Turning to the merits, which was before this court, for the August, September, and December 2007 contacts, Mr. Armstrong cannot demonstrate that the MSPB's conclusion lacks substantial evidence where the representation to him and the question he had asked specifically limited the question to those periods, quote, since December of last year, which is 2007. Thus, Ms. Crestwell was diligently trying to respond to Mr. Armstrong's emails, Mr. Armstrong's specific question. And the question comes up, why? Why was Mr. Armstrong interested in the period since December of 2007? And the reason, as is shown at Appendix 177 and can also be seen at 118, is that the agency, TICTA, had received a letter on January 2nd, 2008, in which Kathy Horsley, the hiring official at the USDA, had said, we've heard that the Armstrong matter is all cleared up. Can we get some confirmation? Thus, to Mr. Armstrong and his attorney, and to TICTA, it appeared that as of January 2nd, 2008, Mr. Armstrong – that the USDA was still interested in hiring Mr. Armstrong. That's why the question from Mr. Armstrong's attorney was limited to the period since December and why Ms. Crestwell specifically limited her response to subsequent to December I know of no context. Therefore, the MSPB's decision is supported by the context and the text of the email exchange itself. Also, the MSPB's decision that the contacts in August, September, and December were not material is also supported by the record. Mr. Armstrong's attorney asserts that it was the supervisors who were contacting Ms. Horsley. We believe, however, that it was in fact Ms. Horsley, the USDA official, who contacted Mr. Davis and Mr. Delgado. Thus, it was not because that these supervisors were contacting her out of the blue. It was after she had received the anonymous letters that she had then gone and contacted them to get some more information on Mr. Armstrong. Additionally, the records indicate that the conversations between Agents Rock and O'Malley were purely related to the Privacy Act investigation. Again, Mr. Armstrong asked why was TICTA asking these questions. But the fact is Mr. Armstrong's Privacy Act investigation said someone is releasing confidential information about me. Specifically, they're releasing it to Ms. Horsley. It is only natural, therefore, that the agency, in defending itself in the Privacy Act lawsuit, would send agents to ask Ms. Horsley, from whom are you getting this information? Where is the leak? They are trying to plug it. For the January 2008 telephone call, the board had substantial evidence for its conclusion that there was not a knowing concealment of a material fact when it came to Mr. Armstrong's decision to sign the settlement agreement. First, on the knowing problem, Ms. Cresswell did not know of the five-minute phone call placed to Ms. Horsley. The undisputed record evidence indicates Ms. Cresswell's sworn testimony at deposition that there was a firewall between the investigation of the MSPB litigation and the investigation related to the Privacy Act lawsuit. Thus, Ms. Elisa Sisman was the attorney who was running the Privacy Act lawsuit, and she was not to be talking to Ms. Cresswell about that lawsuit. Second, under that point, the telephone call did not relate to anything that was material. The board's conclusion on this point is supported by substantial evidence. The notes of the investigator said that the question was simply about, you said in your January 2nd letter, everything regarding Armstrong is all cleared up. From whom did you hear that? Because we seem to have a problem that people are leaking information. We want to make sure there's not another leak at the agency. Ms. Horsley then said, well, I learned it from USDA Counsel Craig. He didn't tell me where he learned that information. That is the only evidence in the record about the content of that conversation. The MSPB's conclusion that the settlement agreement related primarily to, one, Mr. Armstrong's ability to testify as law enforcement officer, and two, his ability to, or what the proposed penalty was, is supported by the text of the settlement agreement itself. Therefore, the conclusion that the five-minute telephone call saying, who told you that everything with Armstrong is all cleared up, based on your January 2nd letter, was not material, did not relate to the question of either his ability to testify as law enforcement officer, or what the proposed penalty was, is therefore supported by substantial evidence and should be affirmed. The point that the government wishes to emphasize at the end is that there is even record evidence that even as late as May 2008, after the January contact, certainly after the August, September, and December 2007 contacts, the USDA was still interested in hiring Mr. Armstrong. Ms. Horsley sent a letter on May 5th, which can be found in the back of the government's brief, the government appendix at 400, that said, we received the letter that was sent as part of the settlement agreement, the February 13th, 2008 letter. That said that Mr. Armstrong had accepted a 30-day suspension without pay. I would like some more information on Mr. Armstrong before making a final decision on whether to go forward with this decision on whether to hire him. Could you please provide that information? The terms of the settlement agreement, however, specifically forbade TICTA from making any further communications unless Mr. Armstrong allowed them. Thus, the USDA was unable to respond to the May 2008 letter because it had specifically agreed in the settlement agreement not to make any communications without his consent. Unless there are any questions on the part of the panel, we ask this Court to affirm the decision of the MSPB below. Thank you. Thank you, Mr. Bowen. Mr. Burns. Very briefly, I'm not aware that the plaintiff for this case, the appellant in this case, was ever offered the opportunity by the Board, nor was there any procedure, no rule, no regulation that would have allowed us to submit additional evidence to the Board on its decision since the Court remanded it first to decide timeliness and then to fashion whether it should have an evidentiary hearing. So, we're arguing from a, quote, record that's never been developed. Again, the government keeps talking about the facts and the record. Let them argue that to an administrative law judge. Let them establish their case before an administrative law judge that they didn't commit fraud. Let us call witnesses. Let us present evidence. Let us depose people we weren't able to depose before, such as A.S. Brock and O'Malley, never deposed in the previous case. Let us develop the evidence that can establish fraudulent intent. There is enough information in this matter to indicate fraud. I won't characterize, as the government did, the email exchange between me and Ms. Creswell. I will simply refer you to it and refer you that it's not talking about the December time period from Ms. Creswell. It's talking about the agency's response to Director Horsley's August 2008 inquiries described in the January 2008 letter from Director Horsley. We were talking about December only because that was the time period that was being involved in discussions going forward on whether Armstrong would have to make a statement over to Horsley or not. Much of the government's brief is speculation. Much of it is argument based on a partial record that was developed on an unrelated case between unrelated but overlapping parties. The only thing we're here to ask you is, again, for fairness. We didn't get the opportunity to present what we should have been able to present. If we can present evidence of fraud, so be it. If we can't, at least give us the opportunity to have an evidentiary hearing before the Merit System Protection Board on the central issue because I think we've raised enough. And again, unlike any other appeal I've heard in this case, in this court, in the six or so I've heard and the two times I've appeared here, I've never heard people argue about what the underlying facts would show because usually there's a record that's developed below that we rely upon. All I'm asking you for is the opportunity to give us the ability to base that record. Now, one other thing the government said. It said that we were only interested in the contacts since December. Well, that's illogical. We weren't aware there were any other contacts prior to that. Had we known about them, we would have certainly inquired into them, and we would have certainly been upset to hear that the two very supervisors who my client had alleged had engaged in retaliation, reprisal, discrimination in the underlying suit, whistleblower reprisal, and who had ginned up a false criminal investigation him with the very two officials who contacted Ms. Horsley. I'm quite certain, if there is any waiver, that waiver didn't apply to those two individuals. And I'm also quite certain that whether or not Ms. Horsley knew about it, as this court has correctly opined, an agency speaks not through one employee but through its agents, its supervisors, and its officials. And again, in the final analysis, the government has to come here and argue essentially to you that the board got the underlying evidence right on a, quote, record. All I did was file a petition for review based upon what I knew at that time. I have never been granted the opportunity under any procedure by any entity to develop evidence beyond that point. And to argue that I should have submitted some record or I should have taken additional testimony but didn't have the authority to do so bespeaks what the problem is here. In the final analysis, we just need to have the opportunity to present our case. That's what litigants come to courts for, and that's what federal employees at the end of the day are entitled to. And the final thing we're entitled to is to be treated honestly by the government. If Mr. Armstrong loses or gets fired or is punished, that's one thing. But he's entitled to rely upon the truthfulness of the agency that he's involved in. He's entitled to rely upon the truthfulness of senior officials. He's entitled to rely upon the plain word of lawyers. And he's entitled to trust in that word because they're supposed to be doing their job as well. Now, they fired my client, or they sought to fire him ultimately, initially, for a lack of candor. And there's been an appalling lack of candor on the government side, and we'd like the opportunity to explore that. Thank you, Your Honor. Thank you, Mr. Burns. Thank you, Mr. Bowen. The case is taken into submission.